RCH:LZ/JML/ADR
F. #2022R00128

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

       - against -                     Docket No. 20-CR-064 (AMD)

JAMES ALBERT
      also known as "Jah" and
      "Jah Blize,"

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Joy Lurinsky
Andrew D. Reich
Laura Zuckerwise
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .............................................................................................................. 1

    I.      Evidence Related to the Bribery Conspiracy ........................................................... 2

    II.     Evidence Related to Drug Conspiracy ..................................................................... 4

          A.     Legerme and Robinson Pick up Drugs ....................................................... 4

          B.     Legerme and Robinson Deliver Drugs to the Defendant ............................ 6

          C.     The Defendant is Paid for the Drugs............................................................ 8

    III.    Defendant's Cross-Examinations of Government Witnesses .............................. 10

    IV.    Post-Trial Motion ................................................................................................ 12

APPLICABLE LAW ...................................................................................................... 12

ARGUMENT ................................................................................................................. 14

    I.      The Government's Evidence of Guilt Was Overwhelming.................................. 14

    II.     The Defendant's Arguments are Meritless .......................................................... 16

CONCLUSION................................................................................................................ 18

TABLE OF AUTHORITIES

**Cases**

United States v. Anderson,
    747 F.3d 51 (2d Cir. 2014) ................................................................................. 14

United States v. Atilla,
    966 F.3d 118 (2d Cir. 2020) ................................................................... 12, 13, 15

United States v. Autuori,
    212 F.3d 105 (2d Cir. 2000) ............................................................................... 12

United States v. Crowley,
    318 F.3d 401 (2d Cir. 2003) ............................................................................... 12

United States v. Frampton,
    382 F.3d 213 (2d Cir. 2004) ............................................................................... 14

United States v. Huezo,
    546 F.3d 174 (2d Cir. 2008) ............................................................................... 17

United States v. Jabar,
    19 F.4th 66 (2d Cir. 2021) ................................................................................. 13

United States v. James,
    239 F.3d 120 (2d Cir. 2000) ............................................................................... 13

United States v. Landesman,
    17 F.4th 298 (2d Cir. 2021) ..................................................................... 13, 14, 18

United States v. Lorenzo,
    534 F.3d 153 (2d Cir. 2008) ............................................................................... 13

United States v. Mariani,
    725 F.2d 862 (2d Cir. 1984) ............................................................................... 14

United States v. Rea,
    958 F.2d 1206 (2d Cir. 1992) ............................................................................. 18

United States v. Riggi,
    541 F.3d 94 (2d Cir. 2008) ................................................................................. 13

United States v. Triumph Cap. Grp., Inc.,
    544 F.3d 149 (2d Cir. 2008) ......................................................................... 13, 16

United States v. Wexler,
    522 F.3d 194 (2d Cir. 2008) ............................................................................... 14

PRELIMINARY STATEMENT

Defendant James Albert was convicted after trial of conspiracy to violate the Travel Act by bribing prison guards and conspiracy to distribute and possess with intent to distribute marijuana and buprenorphine (suboxone).  The defendant's conviction was based on his participation in a scheme in which he bribed prison guards to smuggle drugs into Rikers Island while he was an inmate there.  During the defendant's trial, the government introduced evidence of this scheme, which included: (1) records of bribery payments made on the defendant's behalf to the prison guards and payments received on the defendant's behalf from other inmates; (2) video of one of the prison guards delivering packages to the defendant at Rikers Island; (3) testimony describing a meeting between one of the defendant's co-conspirators and a Rikers Island prison guard; (4) recorded phone calls in which the defendant used coded language to talk about drugs; and (5) testimony of one of the prison guards that the defendant bribed.

The defendant now moves for a judgment of acquittal claiming this evidence was insufficient to show the objects of the conspiracy.  His motion should be denied because the evidence against him at trial was more than enough for the jury to convict him beyond a reasonable doubt.

BACKGROUND

Defendant James Albert's trial lasted from November 28, 2022 to December 1, 2022.  During this time, the government called five witnesses and introduced approximately 100 exhibits.  The government's witnesses were former Rikers prison guard Patrick Legerme, the defendant's estranged wife Celena Burgess, Department of Corrections Captain Ali Fayad, Department of Investigations Investigator Andrew Walker, and FBI Special Agent Daniel White.

The government's exhibits included recorded phone calls, video footage, financial records, phone records, records from the Department of Corrections, and photographs. The defendant did not call any witnesses and introduced approximately five exhibits.

The evidence introduced by the government painted a clear picture of the defendant's criminal behavior from February to June 2019 while he was an inmate at Rikers Island. The evidence showed that the defendant first arranged for individuals, like Trevor Bodden, to give drugs to Rikers prison guards Karin Robinson and Patrick Legerme. Then, the prison guards brought the drugs into Rikers Island in exchange for the bribes, which the defendant directed his wife to pay. And, finally, the defendant sold the drugs to other inmates who paid him by transferring money to Cash App accounts controlled by Trevor Bodden and Celena Burgess.

I.    Evidence Related to the Bribery Conspiracy

At trial, the government introduced testimony and exhibits showing that the defendant used payments from Celena Burgess's Cash App account to bribe Patrick Legerme and Karin Robinson.

The government's evidence showed that the defendant bribed Legerme in or around June 2019. Legerme testified that he met the defendant when he was working as a guard on Rikers Island. (Tr. 87).[1] He further testified that he observed that the defendant appeared to be in charge of his housing unit and told other inmates what to do. (Tr. 90-91). Legerme

---

[1]    "Tr." refers to the transcript of the trial in this matter. "GX-__" refers to the government's exhibits admitted at trial. "GX-__T" refers to transcripts of admitted call recordings provided to the jury and to the Court but not admitted into evidence. "DX-__" refers to the defendant's exhibits admitted at trial.

explained that the defendant approached him and offered him $1,500 in exchange for bringing contraband into the jail, and that he agreed to do so.  (Tr. 92-94).

The defendant then ensured that Legerme was paid $1,500.  In a recorded phone call from Rikers Island on June 6, 2019, the defendant told Burgess, "Somebody gonna hit you later with a request."  (GX-235 at 03:02; GX-235T at 5).  Burgess testified that this statement meant that she should expect a request for money on Cash App.  (Tr. 170-71, 177).  Cash App records show that the next day, June 7, 2019, Burgess made a $1,500 payment from her Cash App account to Legerme's Cash App account.  (GX-400; GX-401).  Then, in a recorded phone call that same day, Burgess advised the defendant that someone had indeed reached out to her on Cash App.  (GX-236 at 00:30; GX-236T at 2; Tr. 177-78).

The government also introduced evidence that the defendant bribed Karin Robinson on six occasions from March to May 2019.  Cash App records show that Burgess made payments of $1,000 to Robinson's Cash App account on March 26, April 4, April 10, April 21, May 8 and May 17, 2019.  (GX-400.5).  On each of these dates, Burgess attached a note to the payment which read either "jah," "Jah" or "for jah."  (Id.).  Records from Rikers Island as well as witness testimony demonstrated that "Jah" was the defendant's nickname.  (GX-607; Tr. 71, 162).  Burgess also testified that the payments from her Cash App account to Robinson's account were made for the defendant at his instruction.  (Tr. 173-74).  A recorded call on April 4, 2019 provided one example of the defendant instructing Burgess to make a Cash App payment to Robinson.  In this call, Burgess asked the defendant if she should pay $1,000 to "K" and he confirmed that she should.  (GX-218 at 00:17; GX-218T at 2).  That same day Burgess sent a $1,000 payment directly to Karin Robinson on Cash App.  (GX-400; GX-400.5).  Similarly, in a recorded call on May 16, 2019, the defendant instructed Burgess, "you got with that Cash

3

App? . . . Send that to K." (GX-234 at 03:00; GX-234T at 4-5). Burgess testified that, on that call as well, the defendant was instructing her to "[s]end money" on Cash App to the individual they referred to as "K," to whom the defendant frequently asked her to make $1,000 payments. (Tr. 173-75). The following day, Burgess sent a $1,000 payment directly to Karin Robinson on Cash App. (GX-400; GX-400.5).

## II.     Evidence Related to Drug Conspiracy

The government's trial evidence also showed how the bribes the defendant paid went towards getting drugs into Rikers Island, which he intended to sell. The government's evidence showed that both Karin Robinson and Patrick Legerme met with the defendant's co-conspirators to receive packages containing drugs. Then these Rikers prison guards brought the packages into Rikers. And, finally, the defendant was paid by other inmates for the drugs.

### A.     Legerme and Robinson Pick up Drugs

During his testimony, Legerme described meeting a woman named "Lauren" who gave him marijuana to smuggle into Rikers Island. He testified that the defendant provided him Lauren's phone number and he arranged with Lauren to pick up a package. (Tr. 93-99). Legerme's phone records show that he communicated with a phone subscribed to Lauren Peterson, who was connected to Michael Peterson, an inmate housed in the same unit as the defendant. (GX-503.1; GX-505; GX-603; GX-604). Legerme testified that he met Lauren outside a Burger King and that she gave him a package. (Tr. 96-99). Legerme believed this package contained marijuana because it smelled like marijuana. (Tr. 100-101).

The evidence also showed that Robinson, like Legerme, met with other individuals to receive packages of drugs for the defendant. Captain Ali Fayad testified that he witnessed a meeting between Robinson and Trevor Bodden, one of the defendant's co-conspirators. On the evening of April 10, 2019, Captain Fayad was conducting a site survey

4

near Bodden's home when he saw Robinson parked nearby in her car.  (Tr. 321-323).  Captain

Fayad then observed Bodden enter Robinson's car while carrying a bag.  (Tr. 324-325).  Captain

Fayad took photographs of Robinson's car, which were introduced as Government Exhibit 712

during trial.  These photographs showed the license plate on the car, which matched New York

Department of Motor Vehicle records for Robinson's license plate.  (GX-707).

        In addition to Captain Fayad's observation of the meeting between Robinson and

Bodden, recorded calls from Rikers Island also referenced this meeting as well as other similar

meetings.  On April 9, 2019, the day before the meeting between Bodden and Robinson, the

defendant told Bodden on a recorded call, "I already spoke to my people, they['ll] pull up on

you."  (GX-221 at 02:27; GX-221T at 4).  On the day of the meeting between Bodden and

Robinson, April 10, 2019, Bodden told the defendant that he was "trying to get the shit situated

before 4 o'clock."  (GX-222 at 02:30; GX-222T at 6).  In context, it is clear that he was

preparing drugs for the drop-off with Robinson that evening.  On another call on March 3, 2019,

the defendant set up a different meeting between Robinson and Bodden.  (GX-203 at 04:15;

GX-203T at 6-11).  During this call, the defendant gave Bodden a phone number and told

Bodden to text that number to arrange a meeting.  (GX-203 at 07:14; GX-203T at 9).  Phone

records showed that that number belonged to Robinson.  (GX-511).  Following the defendant's

instructions, Bodden sent a text message to the number saying, "Jah say you can come – you can

call me for the clothes, I'm in Queens and I'mma wait for your call."  (GX-203 at 08:50;

GX-203T at 10).  Earlier on the same call, the defendant stated that his "bitch," who Bodden was

supposed to meet, "live[s] in Queens."  (GX-203 at 5:25; GX-203T at 7).  Employment records

confirmed that Robinson lived in Queens.  (GX-601).

B.      Legerme and Robinson Deliver Drugs to the Defendant

The government introduced evidence that, after receiving the drugs from the defendant's co-conspirators, Legerme and Robinson brought the drugs to the defendant at Rikers Island.

Legerme testified that he brought the package he received from "Lauren" to Rikers Island by hiding it underneath his pants. (Tr. 103). Legerme then gave the package directly to the defendant. (Tr. 104-05). Legerme believed that the defendant was then going to sell the marijuana contained in the package. (Tr. 107-08). He testified that he knew the defendant was selling marijuana at Rikers Island because the defendant told him that he "sells in here," which Legerme understood to be a reference to selling marijuana. (Tr. 92-93).

Robinson also delivered packages to the defendant, and these deliveries were captured on surveillance video. On April 5, 2019, surveillance video captures Robinson handing an object directly to the defendant in an empty vestibule outside his housing unit. (GX-302; GX-303). On April 15, 2019, surveillance video captures Robinson handing an object to another inmate who then places the object in the defendant's cell. (GX-304; GX-305). The video then shows Robinson talking with the defendant before he immediately goes back to his cell where the object was placed. (Id.).

In addition to the suspicious methods used to deliver these packages, the government introduced other evidence that these packages contained drugs, specifically marijuana and buprenorphine (suboxone). In recorded telephone calls, the defendant and Bodden discussed marijuana using the code word "Oakland Raiders." Investigator Walker testified that Oakland Raiders was one of many code words used by Rikers Island inmates. (Tr. 269-270). He testified that he became familiar with these code words by reviewing resources including a law enforcement dictionary and "paperwork" recovered from inmates' cells that

6

contained lists of code words and definitions of those words.  (Id.).  Investigator Walker

explained that, using these resources, he learned that Oakland Raiders was code for marijuana.

(Id.).

        The government introduced as evidence a number of calls using the Oakland

Raiders code word.  For example, in the same March 3, 2019 call in which the defendant

instructed Bodden to text Robinson, Bodden told the defendant "my part is good.  Like, as far as

like – Oakland Raiders."  (GX-203 at 04:15; GX-203T at 6).  In this portion of the call, Bodden

used the code word Oakland Raiders to let the defendant know that the marijuana was ready to

be picked up by Robinson.  This was not the only time the defendant and his co-conspirators

used this code word.  In four separate calls on April 27, 2019, the defendant told Bodden that he

was upset with a package he received and the two tried to reconcile the amount of drugs that

were supposed to be in the package.  (GX-226; GX-227; GX-228; GX-229).  In one of those

calls, the defendant and Bodden talked about the "standard count" for the "Oakland."  (GX-226

at 02:13; GX-226T at 4).  During that call, Bodden told the defendant that he was supposed to

have "8" and the defendant replied that he only had "4 Oakland."  (GX-226 at 03:35; GX-226T

at 6).  That same day, video introduced at trial showed the defendant talking with Robinson for

approximately seven minutes in an empty vestibule outside the defendant's housing unit.

(GX-306).  While the video did not contain sound, the gestures and facial expressions in the

video indicated that Robinson and the defendant were engaged in a serious discussion.  (Id.).

        In addition to calls which used coded language to refer to marijuana, the

government also introduced calls which used coded language to refer to suboxone.  In calls on

March 23, 2019 and March 24, 2019, the defendant and Bodden discussed suboxone by referring

to its orange color.  In the March 23 call, the defendant referred to "the oranges" and "sell[ing]

the oranges" (GX-211 at 09:10; GX-211T at 16), and in the March 24 call the defendant told

Bodden that someone would "pull back up on you with them orange shirts" (GX-212 at 02:30;

GX-212T at 5).  Investigator Walker testified that these references to "oranges" and "orange

shirts" were code for suboxone.  (Tr. 276-78).  In addition, during an April 11, 2019 call, the

defendant and Bodden discussed how to package the drugs Bodden was going to deliver.  The

defendant told Bodden that Bodden needed "saran" wrap (GX-224 02:20; GX-224T at 4), and

Bodden stated that "you gotta be careful with them shits" (GX-224 03:54; GX-224T at 6).  The

defendant also described to Bodden how the drugs should be packaged: "One, wrap, one, wrap,

one." (GX-224 04:15; GX-224T at 7).  In other words, the defendant told Bodden that Bodden

needed to carefully wrap each dose of the drug so that he did not touch them.  This is indicative

of suboxone because, as Investigator Walker testified, a person should not touch suboxone

directly or else he or she can get a contact high.  (Tr. 265-66).

   In other recorded calls, the defendant's co-conspirators told the defendant that

they were worried about being caught with illegal drugs.  For example, in a three-way call on

May 2, 2019, Robinson spoke directly to the defendant and told him that she was worried

because "it's getting hot" and she did not want to walk "into a trap."  (GX-230 at 07:15;

GX-230T at 9).  Similarly, in a different call on March 5, 2019, another one of the defendant's

co-conspirators told the defendant that he was worried about the drugs he was holding.  He said,

"I get two years for getting caught with it, what I got waiting on you."  (GX-206 at 01:09; GX-

206T at 3).  In other words, the defendant's co-conspirator said he could get two years in prison

because of the drugs he had for the defendant.

   C.  <u>The Defendant is Paid for the Drugs</u>

   The government also introduced evidence that the defendant was paid by other

inmates for the drugs.  Cash App records showed over $40,000 in payments to Burgess's and

8

Bodden's Cash App accounts during the conspiracy.  (GX-400; GX-400.4).  These payments were typically in 50- or 100-dollar increments, which is consistent with Investigator Walker's testimony about the prices of marijuana and suboxone on Rikers Island at that time.  (Tr. 261-62, 264-65).  And the timing of these payments coincided with deliveries from Robinson to the defendant.  For example, in the few days following Robinson's April 5, 2019 delivery to the defendant, Bodden and Burgess received several thousand dollars in Cash App payments.  (GX-400; GX-400.2).

Burgess testified that the payments on her Cash App account were for the defendant and made on behalf of inmates.  (Tr. 164-65, 169-70).  The payments themselves reflect this.  For example, in notes attached to the payments, some individuals wrote the inmate's housing area within the George R. Vierno Center ("GVRC"), the jail complex where the defendant was housed.  (See generally, GX 400).  The defendant's housing area was area 7B (GX-602) and the other housing areas within GRVC were similarly numbered with "A" or "B" at the end (Tr. 251-52).  The Cash App notes referencing GRVC and its housing areas included, among others, "young sean housing area 11a," "CJ rilana in 5a," "black 11a 15 cell," "from SiltoGRVC15B," "forty in GRVC," and "japp shine 7b."  (GX-400 at 3, 4, 9, 22, 24).

Recorded calls between Burgess and the defendant also show that the Cash App payments from the inmates were intended for the defendant.  On the calls, Burgess used code words to tell the defendant how much money he received from different individuals.  (Tr. 166-67, 170-72).  For example, during a call on May 15, 2019, Burgess told the defendant that "Green eyes liked your picture," and that "Dot and Gangster Liked and poked."  (GX-233 at 10:50; GX-233T at 19).  Burgess testified that those were individuals who had paid the defendant and that, on the call, she was relaying that information to the defendant using code words.  (Tr.

9

170-72).  Cash App records reflect several payments to Burgess's account that same day, including one for $100 with the message, "from green eyes," and one for $150 with the message, "dot and gangster."  (GX-400 at 15).  Recorded calls between the defendant and Bodden captured similar conversations.  In these calls, Bodden, like Burgess, read the defendant lists of people who paid him on Cash App, which matched the Cash App records from Bodden's account.  For example, during a call on April 10, 2019, Bodden told the defendant, "Smoov half a yard," "Fred Flowers, a man," and "Sean, a man."  (GX-222 at 00:57; GX-222T at 3).  Cash App records reflect several payments to Bodden's account on April 9 and April 10, 2019, including one for $50 with the message, "from smoove," one for $100 with the message, "from Fred Flowers," and one for $100 with the message, "Sean."  (GX-400 at 87).

III.     Cross-Examinations of Government Witnesses

During the trial, defense counsel cross-examined the government's witnesses in an attempt to undermine their credibility.

The defendant challenged Legerme's credibility by pointing out that he had engaged in criminal conduct by bringing contraband into Rikers Island on multiple occasions for multiple inmates.  (Tr. 119-20, 131, 133-35).  In particular, the defendant asked Legerme to admit that he lied to his superiors about bringing contraband into Rikers Island.  (Tr. 146-48).  In response to these questions, Legerme stated that he did not report to his superiors that he was bringing contraband into the jail, but he explained that he never explicitly stated that he was not bringing in contraband.  (Id.).  The defendant also asked Legerme about a text message sent by Legerme in which Legerme references "sell[ing] [] drugs."  (Tr. 130-32).  Legerme testified that this text message referred to getting "paid by inmates to bring in drugs" to Rikers Island.  (Tr. 132).

The defendant also challenged Legerme's credibility using a report of a meeting between Legerme and the government in October 2019. (Tr. 129). The defendant asked Legerme whether, based on the report, he recalled telling the government during that meeting that the package he received from "Lauren" did not have an odor. (Tr. 129-30). Legerme testified that he did not recall saying that, and that he believed he had said that the package did have an odor. (Id.). During redirect, Legerme explained that he had never reviewed agents' interview notes or reports and was not given an opportunity to correct them. (Tr. 151-52). The defendant also asked Captain Fayad about this meeting and showed Captain Fayad the report. After looking at the report, Captain Fayad said that it was "possible" that Legerme had said the package had no odor. (Tr. 347-48). In response to clarifying questions from the Court, Captain Fayad stated that he did not remember whether Legerme had said that the package was odorless during this meeting. (Id.).

The defendant challenged Investigator Walker's credibility by implying that the government assisted Investigator Walker in crafting a revised resume. On cross examination, the defendant asked Walker about two different resumes that the government had shared with the defense. (Tr. 239-42, 289, 291-98). Walker testified that he regularly had two resumes, one for the Department of Corrections (where he was employed) and one for when he was looking for outside jobs. (Tr. 294-96). He testified that he sent both resumes to the government and then sent a third updated resume after the government requested it. (Id.).

The defendant cross examined Burgess by suggesting that the money on Burgess's Cash App came from the defendant's sale of drawings rather than drugs. The defendant introduced as exhibits some of the drawings he had sent to Burgess and asked her if she believed the drawings were the source of the defendant's income, and Burgess testified that

11

she believed they were.  (Tr. 196-98, 202-04; DX-A; DX-B, DX-C).  On redirect, Burgess

confirmed that she believed this was the case because that is what the defendant told her and that

she did not have any first-hand knowledge that this was the case.  (Tr. 211-12).

    IV.    <u>Post-Trial Motion</u>

        At the close of the government's case, the defendant did not move for a judgment

of acquittal.  Rather, he reserved his motion for acquittal until after the jury verdict.  (Tr. 413,

432).  When the jury returned a verdict of guilty on all counts, the defendant proposed submitting

a written motion for acquittal.  (Tr. 589).  On January 6, 2023, the defendant filed the instant

motion under Federal Rule of Criminal Procedure 29 arguing that the government failed to prove

beyond a reasonable doubt that he conspired to commit bribery and sell drugs at Rikers Island.

In particular, the defendant challenged the government's proof of the objects of these

conspiracies, arguing that the government's witnesses were not credible and that other evidence

was lacking.

APPLICABLE LAW

        A defendant moving for a judgment of acquittal under Rule 29 due to insufficient

evidence "bears a very heavy burden."  <u>United States v. Crowley</u>, 318 F.3d 401, 407 (2d Cir.

2003).  A conviction must be upheld if "<u>any</u> rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt."  <u>United States v. Autuori</u>, 212 F.3d 105, 114

(2d Cir. 2000) (emphasis in original).  In other words, a court should only grant a Rule 29 motion

when "the evidence that the defendant committed the crime alleged is nonexistent or so meager

that no reasonable jury could find guilt beyond a reasonable doubt."  <u>United States v. Atilla</u>, 966

F.3d 118, 128 (2d Cir. 2020).  On the other hand, a motion for acquittal should not be granted

when "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible"

12

because, in that scenario "the jury [must] decide the matter." United States v. Jabar, 19 F.4th 66, 76 (2d Cir. 2021).

In evaluating the sufficiency of the evidence, a court "must view the evidence in the light most favorable to the government." Atilla, 966 F.3d at 128. This means that a court "must credit every inference that the jury might have drawn in favor of the government." Id. A court must also examine the totality of the government's evidence together rather than evaluating each piece of evidence in isolation because "each fact may gain color from others." Id. And it is not fatal to the government's case if its evidence is circumstantial rather than direct. United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008); United States v. James, 239 F.3d 120, 123-24 (2d Cir. 2000). In addition, when presenting its case, "the Government need not negate every theory of innocence." United States v. Landesman, 17 F.4th 298, 319 (2d Cir. 2021).

Motions for acquittal cannot be granted based on a court's determination of witness credibility. Rather, a court evaluating a motion for acquittal must defer to the jury's determination of credibility. As the Second Circuit has explained, "courts must defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony when reviewing the sufficiency of the evidence." United States v. Triumph Cap. Grp., Inc., 544 F.3d 149, 158–59 (2d Cir. 2008). This deference is required even when the government's witnesses are testifying pursuant to cooperation agreements. United States v. Riggi, 541 F.3d 94, 108 (2d Cir. 2008) ("All issues of credibility, including the credibility of a cooperating witness, must be resolved in favor of the jury's verdict.")

The "high degree of deference" given to the jury's verdict "is especially important when reviewing a conviction of conspiracy." United States v. Landesman, 17 F.4th 298, 320 (2d Cir. 2021). "'This is so because a conspiracy by its very nature is a secretive operation, and it is

13

a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a

surgeon's scalpel.'" Id. (quoting United States v. Anderson, 747 F.3d 51, 73 (2d Cir. 2014)).

"The 'agreement to participate in the conspiracy may be inferred from the facts and

circumstances of the case,' and 'both the existence of the conspiracy and the defendant's

participation in it with the requisite criminal intent may be established through circumstantial

evidence.'" Id. (quoting United States v. Wexler, 522 F.3d 194, 207-08 (2d Cir. 2008)).

"Moreover, 'seemingly innocent acts taken individually may indicate complicity when viewed

collectively and with reference to the circumstances in general.'" Id. (quoting United States v.

Mariani, 725 F.2d 862, 865-66 (2d Cir. 1984)).

ARGUMENT

The defendant's motion should be denied because he has not met the heavy

burden necessary to overturn the jury's verdict.  The government's evidence established beyond

a reasonable doubt that the defendant conspired to bribe prison guards and distribute drugs.  This

evidence included not only witness testimony but also recorded phone calls, financial records,

videos, and photographs.

I.      The Government's Evidence of Guilt Was Overwhelming

The government's evidence proved beyond a reasonable doubt that the defendant

conspired to bribe prison guards.  First, Legerme testified that the defendant paid him to bring

drugs into prison.  This testimony, which the jury found credible, would be enough to prove that

the defendant committed this crime.  See, e.g., United States v. Frampton, 382 F.3d 213, 222 (2d

Cir. 2004) (reaffirming prior precedent that testimony of a single uncorroborated eyewitness is

generally sufficient to support a conviction).  But this testimony was far from the government's

only evidence that the defendant was bribing guards.  The government introduced Cash App

records showing $7,500 transferred from Burgess's Cash App account to Legerme's and

14

Robinson's accounts.  And the government introduced recorded calls in which the defendant instructed Burgess to make these payments.  The government also introduced testimony from Burgess who stated that she made these payments on the defendant's behalf and at his direction. Her testimony that the payments were made on behalf of the defendant was also corroborated by the notes in the payments themselves, which referenced "Jah," a name used by the defendant.

The government also introduced overwhelming evidence that the defendant conspired to distribute and possess with intent to distribute drugs.  Again, Legerme's testimony alone was sufficient to prove this crime.  Legerme testified that he brought marijuana into Rikers Island for the defendant to sell in exchange for his bribe payments.  But the government's proof went well beyond this testimony.  The government introduced numerous calls in which the defendant used coded language like "Oakland Raiders" and "orange shirts" to talk with his co-conspirators about acquiring marijuana and buprenorphine, packaging them, and getting them into Rikers Island.  On these calls, he arranged multiple meetings with Robinson so that she could receive the drugs.  He even spoke directly to Robinson and she told him she was worried about getting caught.  The government also introduced testimony from Captain Fayad who observed a meeting between Robinson and Bodden and took photographs of Robinson's license plate, confirming that the person he observed was Robinson.  The government also introduced video of Robinson delivering packages inside Rikers Island for the defendant.  And the government introduced records of Cash App payments from Rikers Island inmates to the defendant's wife consistent with payments for drugs.

The government's evidence was even stronger when considered in its totality because multiple pieces of evidence often shed light on each other.  See Atilla, 966 F.3d at 128. For example, Captain Fayad observed a meeting between Bodden and Robinson on the same day

15

that Bodden told the defendant he was trying to have the drugs ready by four o'clock for delivery.  As another example, Cash App payments from inmates to Burgess and Bodden increased dramatically in the days immediately following a delivery from Robinson to the defendant captured on video surveillance, which further supports the inference that she delivered drugs which the defendant sold.  Yet another example is that video footage shows the defendant arguing with Robinson on the same day as four different recorded calls in which the defendant complained to his co-conspirator about a drug package he received.  The jury could reasonably infer that the defendant was arguing with Robinson because she had delivered the drugs he was unsatisfied with.

## II.    The Defendant's Arguments are Meritless

In the face of the government's multitudes of evidence, the defendant's arguments in favor of acquittal are meritless.  The defendant argues that Legerme was not credible because Legerme hid from his superiors the fact that he was bringing contraband into Rikers and because the October 2019 meeting summary suggests that Legerme initially told the government the package he retrieved for the defendant was odorless.  But the defendant made these arguments to the jury who rejected them and found Legerme credible.  The Court must defer to the jury's finding of credibility.  Triumph Cap. Grp., Inc., 544 F.3d at 158–59.  Even if the Court were not required to defer to this finding, Legerme's testimony was corroborated by other evidence.  This evidence included Cash App records showing that the defendant used Burgess's account to pay Legerme $1,500, calls between Burgess and the defendant discussing this payment, and phone records showing that Legerme was in contact with Lauren Peterson around the time that he testified he met up with "Lauren" to receive drugs.  Furthermore, even setting aside the evidence

16

related to Legerme, the government introduced ample evidence of the defendant's conspiracy to bribe Robinson.

        The defendant also argues that Investigator Walker's testimony was incredible because Investigator Walker stated that he revised his resume after a request from the government.  As with Legerme's credibility, this argument was raised to the jury and rejected, and the court cannot revisit the jury's credibility determination.  In addition, Walker's testimony was consistent with other evidence introduced by the government and commonsense deductions. For example, the defendant describing the "count" for the Oakland Raiders corroborates that this was a code word for drugs.  And the jury was entitled to draw the commonsense conclusion that the defendant was not talking about the Oakland Raiders football team because it was not football season, the defendant could not go to an Oakland Raiders game from jail, and it does not make sense to say that you have the "standard count" of a football team.  United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008) ("[J]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences.")  The defendant's other phone calls also corroborated that he was discussing drugs.  For example, one of his co-conspirators complained that he could be sentenced to two years in jail for the drugs he was holding for the defendant.  Legerme's testimony also corroborated Investigator Walker's testimony.  Legerme testified that the defendant was selling marijuana and Walker testified that the coded calls with the defendant discussed marijuana.

        The defendant also argues that the court should consider alternative explanations for the government's evidence, such as the explanation that the defendant was selling drawings. This argument again improperly asks the court to substitute its judgment for the judgment of the jury.  In the face of competing inferences, the court must defer to the jury's judgment regarding

17

which inference to accept.  United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir. 1992)

("Matters of the choice between competing inferences, the credibility of the witnesses, and the

weight of the evidence are within the province of the jury, and [the court is] not entitled to

second-guess the jury's assessments.")  In any event, that evidence was inconsistent with

alternative explanations.  The defendant made over $40,000 in a five-month period from

payments that were typically $50, $100, or $150.  It is incredible to believe he made this money

selling cartoon drawings.  This explanation is also inconsistent with the recorded phone calls in

which the defendant talked about drugs and with Legerme's testimony that the defendant was

selling drugs.

Finally, the defendant faulted the government for not presenting additional

evidence such as observations of hand-to-hand drug buys or a witness who saw the defendant

holding drugs.  But the government was not obligated to put on any specific type of evidence.

This was particularly true because this case involved a conspiracy in which the defendant and his

co-conspirators were attempting to hide their criminal behavior.  See, e.g., Landesman, 17 F.4th

at 320 ("[A] conspiracy by its very nature is a secretive operation, and it is a rare case where all

aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.")  In

addition, the defendant is incorrect that no one testified who saw him with drugs.  Legerme

testified that he placed a package containing marijuana into the defendant's hand.  (Tr. 105).

CONCLUSION

The government's evidence, which included videos, audio recordings, financial

records, phone records, photographs, and testimony from two members of the defendant's

conspiracy was more than sufficient to prove beyond a reasonable doubt that the defendant

conspired to bribe prison guards and distribute drugs.  Therefore, the defendant's motion for a

judgment of acquittal should be denied.

Dated:      Brooklyn, New York
            February 6, 2023

                                        Respectfully submitted,

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        Attorney for Plaintiff
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                              By:       _/s/_____
                                        Joy Lurinsky
                                        Andrew D. Reich
                                        Laura Zuckerwise
                                        Assistant United States Attorneys
                                        (718) 254-7000